**IN THE COURT OF APPEALS OF IOWA**

No. 22-0749
Filed June 29, 2022

**IN THE INTEREST OF L.F.,**
**Minor Child**

**B.F., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Story County, Stephen A. Owen, District Associate Judge.

A father appeals the denial of his motion to close the child-in-need-of-assistance case. **AFFIRMED.**

Jesse A. Macro, Jr. of Macro & Kozlowski, LLP, West Des Moines, for appellant father.

Christine E. Branstad of Branstad & Olson Law Office, Des Moines, for appellee mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Shannon M. Leighty of the Public Defender's Office, Nevada, attorney and guardian ad litem for minor child.

Considered by May, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

The father of a teenaged child[1] appeals the juvenile court's denial of his request to close the child–in–need-of-assistance (CINA) case, as recommended by the Iowa Department of Human Services (DHS)—but opposed by the mother.[2] The juvenile court, after dismissing the case once, says not this time. Notably, the State, on behalf of DHS, indicated it would not file a response to the father's appeal as it could not defend the juvenile court order. The juvenile court considered the motion to close the case at the permanency hearing held in March 2022, but it denied the motion. The father timely appeals from that order.

To open, a panel of our court considered the juvenile court's dismissal of this CINA action over a year ago. *See In re L.F.*, No. 21-0002, 2021 WL 1400086, at *4 (Iowa Ct. App. Apr. 14, 2021) (reversing the juvenile court's dismissal of the CINA proceeding "[b]ecause the father continues to minimize and deny the sexual misconduct, and because L.F. has limited ability to recognize and communicate any sexual misconduct she may experience"). The detailed history of the case was set out in that decision:

> L.F. was born in 2005. She has intellectual disabilities and functions at about a second-grade level. She needs at least occasional assistance dressing, bathing, and toileting. She cannot speak, but she can communicate limited concepts using an assistive electronic device or nonverbal signals.
> The mother and father were previously married. They had four children together—two boys and two girls, L.F. and her older sister S.F. The mother filed a petition for dissolution of marriage in

---

[1] These parents share legal custody of the child with the mother providing physical care. There are other children in this family; they are not a part of this proceeding.
[2] The State did not file a notice of appeal and informs it will not file a response defending the juvenile court order given DHS's position supporting case closure. On the other hand, the mother timely filed a response after the case was transferred to us and we consider her arguments in this appeal.

February 2016. In October 2016, the mother contacted [DHS] to report she suspected the father sexually abused S.F. and L.F. As part of the investigation, the mother also reported she suspected the father sexually abused her female cousin K.S. DHS noted L.F., as a child with special needs, was "very vulnerable" and the father showed "very concerning sexualized behaviors," but DHS ultimately determined the allegation of abuse against S.F. and L.F. was not founded. In December 2017, the district court entered a decree that dissolved the parents' marriage, granted joint legal custody, placed physical care with the mother, and ordered visitation with the father that included supervised overnight visits with L.F.

The family again came to the attention of DHS in July 2018 when the mother reported a witness saw L.F.'s hand on the father's crotch over his clothes and the father did nothing to move or redirect L.F. The juvenile court soon ordered L.F. temporarily removed from her father's care. In September, DHS determined the allegation of abuse against L.F. was unfounded in light of an ongoing criminal investigation into the matter that limited the DHS investigation. In October, the court entered a stipulated order finding L.F. was a [CINA].

On November 26, 2018, the juvenile court held a dispositional hearing in which the mother submitted evidence of the father's prior alleged sexual misconduct. First, the mother testified that when S.F. was three years old, the father "accidentally" put his finger inside her vagina while bathing her. Second, the mother provided records from the father's conviction of a sex offense in Minnesota for a 2012 incident in which he fondled a female physician's breast during a medical appointment for one of the children. Third, K.S. provided a letter accusing the father of multiple incidents of sexual misconduct in or around 2007 when K.S. was fifteen years old and staying with the family. According [to] K.S.'s letter, the father: encouraged K.S. to sit on his lap in a hot tub; stayed in and around K.S.'s room for an extended time right before she planned to undress to take a shower and go to sleep; and rode with K.S. on a four-wheeler and fondled her breasts when they were alone. Fourth, S.F., who was seventeen years old at the time of the hearing, provided a letter and testified to allegations the father engaged in sexual misconduct toward her. S.F. alleged the father: cuddled and spooned S.F. in bed and on the couch; frequently walked into the bathroom while S.F. was showering; looked down S.F.'s shirt and stared at her buttocks while she was bent over; and repeatedly pressed his body against hers as he walked past. Additionally, S.F. said the father continued bathing L.F. and told S.F. to lie and say she was bathing L.F.

On November 28, 2018, the juvenile court issued the dispositional order at issue here. The court found the father "has a very concerning history of . . . sexualized contact primarily involving minor females." The juvenile court noted there is no supporting

evidence for the allegations of sexual misconduct presented at the hearing—other than the Minnesota incident that resulted in conviction—but the court specifically found the father groped K.S. and digitally penetrated S.F.'s vagina. The court also noted a 2016 psychosexual evaluation of the father concluded he does not have a serious mental impairment and is treatable. The court continued the CINA adjudication with a long-term goal of establishing a safe relationship with both parents, and the court allowed L.F. to visit the father with full supervision and restrictions preventing the father from assisting L.F. with toileting, bathing, or dressing.

The juvenile court held a series of permanency review hearings and issued corresponding orders over the next several months. Beginning with the May 13, 2019 permanency order, the court allowed L.F. to visit the father at DHS's discretion. DHS developed a safety plan that allowed for supervised visitation and largely kept the court's initial restrictions in place. By the time of the final hearing on December 21, 2020, DHS primarily provided the safety plan and at least monthly meetings with the family. DHS also allowed either the paternal grandmother or the father's live-in friend to supervise L.F.'s visitations with the father. On December 21, the court issued its order dismissing the CINA action and closing the case. The mother appeals.

*Id.* at *1–2 (footnotes omitted). In that earlier proceeding, the juvenile court found the purposes of the CINA order had been accomplished and the child was no longer in need of supervision, care, or treatment under Iowa Code section 232.103(4)(a) (2018). *Id.* at *2. After the mother appealed and based on that record, our court reversed the juvenile court and returned the case for continued DHS supervision and court oversight. *Id.* at *3–4. The main concern in the first appeal related to the father's "concerning behavior," his "boundary violations," and his avoidance of "taking full responsibility for his sexual behaviors." *Id.* at *2–3. Given the child's limited ability to communicate and self-protect and the father's minimization and denial of sexual misconduct, our court found juvenile court supervision remained a need. *Id.* The case was remanded for further proceedings. *Id.* at *4.

With that directive from the court of appeals and after a permanency review hearing on July 9, 2021,[3] the case returned to juvenile court oversight and visits continued as had been set before the appeal.[4]  In September 2021, the father moved to "close the case" and again urged that the purposes of the previous orders were accomplished and continuation of supervision was "unjustified and unwarranted."  In late March 2022, another permanency review hearing was held, and the juvenile court considered the "motion to close the case," filed under Iowa Code section 232.103(2)(b) (2022).  In April, the juvenile court ordered the CINA adjudication to continue.  The father appeals the April order denying case closure.

We review CINA proceedings de novo.  *In re D.D.*, 955 N.W.2d 186, 192 (Iowa 2021).  We give weight to the juvenile court's findings but are not bound by them.  *Id.*  Overall, our principal concern is the best interests of the child.  *In re L.H.*, 904 N.W.2d 145, 149 (Iowa 2017).  There must be clear and convincing evidence to support the grounds asserted.  *See id.*  In determining the best interests of the child, "we look to the parent['s] past performance because it may indicate the quality of care the parent is capable of providing in the future."  *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (quoting *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997)).

---

[3] Between the closing of the CINA case on December 21, 2020, and the reversal of that order in April 14, 2021, the father went about four months without supervision by DHS.  There were no allegations of any problems during those months, so permanency review hearings were set to occur every nine months, the safety plan was to continue, and DHS would provide any necessary services.  At the time of this permanency hearing, the child was fifteen and a half years old.  The juvenile court noted the parents were "headed to district court in the autumn to address [the mother's] motion to modify custody."

[4] As of June 2020, the father's visits comported with the custody ordered visitation.

By stipulation, the CINA adjudication related to a failure to supervise under Iowa Code section 232.2(6)(c)(2).[5]  Although two grounds were initially alleged, the other ground—that the child had been or was imminently likely to be sexually abused by a parent—was withdrawn.  *See* Iowa Code § 232.2(6)(d).[6]  No one appealed the order of adjudication following disposition.  *See In re Long*, 313 N.W.2d 473, 477 (Iowa 1981) (concluding a pre-dispositional order for adjudication is not a final order appealable as a matter of right).  Thus, the father emphasizes that the case is not over sexual abuse, but was filed as a failure-to-supervise case and, under that rubric, the case is resolved.  He argues since our previous decision, he accepted responsibility for his behaviors and, as confirmed by his therapist, did the necessary work in therapy.  To be sure, from the July 2021 hearing until the March 2022 hearing on the motion to close, the child appeared to be doing well and enjoyed visits, showing no fear of her father.  DHS felt she looked to her father for guidance and attention.  The report also confirmed the child's communication skills have improved.  With that backdrop, DHS requested case closure.  No one reported any new concerns and so DHS was conducting only monthly checks on the family.  The DHS social work case manager felt permanency had been achieved for L.F. and, with the achievement of maximum benefits for the family, there were no new or different services DHS could offer.

---

[5] Under section 232.2(6)(c)(2), a child can be adjudicated CINA if the child has suffered or is imminently likely to suffer harmful effects from "[t]he failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child."
[6] Section 232.2(6)(d) relates to a child "[w]ho has been, or is imminently likely to be, sexually abused by the child's parent, guardian, custodian, or other member of the household in which the child resides."

But this time, the juvenile court disagreed and summarized the status of the case in detail in its April order. Several matters troubled the juvenile court. Some of those matters concerned the mother as well. Pointing to the March 2022 DHS report, the mother quotes from the text that the child still has difficulty recognizing boundaries or concerns for her own safety coupled with a limited ability to communicate. With those concerns still at hand, she contends the protection afforded under CINA proceedings is necessary. Yet, the child returned to the care of both parents in June 2020 and no reports of abuse or neglect have surfaced. Even though he denies sexual misconduct, the father admitted to past poor choices that he claims to have addressed in therapy. DHS maintains the father followed all conditions and expectations required to meet the safety plan crafted for the child. As a part of the proceedings before the juvenile court, the father's therapist opined that the CINA case should be closed as the father will voluntarily adhere to the safety plan and therapy. The father sees his therapist monthly, and she specializes in treating sex offenders.

Still, the juvenile court saw red flags. While the father referenced a safety plan he would put in place, developed with the help of his therapist, he surprisingly could not describe it for the juvenile court at the hearing. And he did not present the plan in writing for consideration by the court. As to the father, the juvenile court found his testimony to be "guarded" and that he seemed to "avoid details in his answers." *See In re T.P.*, No. 19-0162, 2019 WL 3317346, at *4 (Iowa Ct. App. July 24, 2019) ("[W]e defer to the juvenile court's credibility finding that the mother's denial was 'completely unbelievable.'"). Those impressions became more important over the father's answers about his therapy and the safety plan he

claimed to have in place. Even with the clear crossing of sexual boundaries, the father continues to deflect his responsibility, noting that in therapy he talks about how certain actions can affect other people and "how even some of the simplest action can be taken wrong."

To support the findings, the juvenile court thoughtfully summarized the history of the case and detailed over thirty-seven pages the impressions, relevant facts, and legal authorities that lead to the decision. Observing the father, the juvenile court found him to be "evasive" and specifically noted:

> What is a court to make of a man convicted upon his own admission of a sex-related crime, with a concerning history of boundary issues with female youth and a daughter without any capacity for self-protection? Upon this court's thorough review of the last several years of information in this case, the answer appears to be continued supervision.
>
> This is a case that, at a minimum, involves supervision of boundaries. That would not have ever been necessary unless the risk of inappropriately crossing boundaries existed. The risk posed is two-fold, the father's history of overstepping boundaries with adult and minor females and the child's lack of self-protective capacities. These pose safety hazards that the court's aid and supervision have addressed and continue to address.
>
> [The father] has, according to his uncontroverted testimony, addressed boundaries and safety in therapy with [his therapist]. As he plainly stated, he recognizes the harm that inattention to boundaries has caused, although he suggested it was [the child] who needs the boundaries checked as well. He goes on to acknowledge that he wished he handled "it" better.
>
> Therein lies a problem. [The father] acknowledges issues, but only partially recognizes the risks. When he does he generally attempts to spread the responsibility for causing or mitigating the risk to others, including [the child]. He feigns confusion on cross-examination by the [S]tate over the facts originally asserted in the statement of facts. He denies any specific[] facts concerning crossing boundaries with S.F., but also admits some wrong while also professing accountability.

Overall, the court found the "nature of the harm is failure to supervise and respect appropriate boundaries." The juvenile court felt continued supervision was

warranted. In this unique situation, the court hit the nail on the head. *See, e.g.*, *In re T.V.*, No. 02-1746, 2003 WL 21543784, at *2 (Iowa Ct. App. July 10, 2003) (holding that showing sex videos to a young child justified further oversight and services). By continuing the CINA case, the juvenile court found the "minimal, semi-supervised and liberal visitation provided strikes an appropriate balance between safety and the negligible negative results for [the child]." We agree. The DHS caseworker acknowledged the child continued to require "100 percent supervision" and there were no changes in the child's ability to "recognize boundaries or concerns for her own safety." Specifically, the case worker testified:

> Q. Would she—you indicated that she would be able to tell someone in the home and "I don't want to do that"; correct? A. Yes.
> Q. Would she be able to—would she be able to tell someone later on that an individual made her do something that she did not want to do? . . . . A. I don't believe that [the child] would be able to go into that detail. I do believe, in observing [the child], that she could express that she's upset, and that would continue until somebody knew what she was talking about or trying to explain. [The child] doesn't just stop when, you know, you're like, "Okay, stop." She'll just continue in that emotion.
> Q. Would you agree with me that based on your experience, [the child] would not be able to understand that a touch was good or bad unless it hurt her? A. Or unless she was able to say it was uncomfortable, like made her feel uncomfortable; so if it was something pleasurable, she wouldn't be able to describe the pleasure. She wouldn't be able to describe what happened. If that makes sense.

"[C]hild protection statutes 'are designed to prevent probable harm to the child and do not require delay until after harm has occurred.'" *L.H.*, 904 N.W.2d at 152 (quoting *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990)). Here, given the testimony of the DHS caseworker coupled with the history of crossing sexual boundaries with little responsibility for those actions, we find protections for the child are necessary and we need not wait for any crossing of the boundaries to get

there.  *Id.* at 150 (noting "we liberally interpret the phrase 'imminently likely'" because the abuse is not required "to be on the verge of happening before adjudicating a child as one in need of assistance").  Because we do not find much has changed since our earlier decision and agree with the juvenile court that "sustaining the [permanency] goal and planning for ongoing permanency under the unique circumstances of this case requires the court's aid," we affirm the juvenile court's decision.

**AFFIRMED.**